STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ROBERT MARK LUEDER, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued October 7, 1975—Decided November 12, 1975.

Before Judges MATTHEWS, LORA and MORGAN.

*Mr. John H. Ratliff*, Assistant Deputy Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney; *Mr. Edward T. O'Donnell,* of *Robinson, Wayne and Greenberg,* designated counsel, of counsel and on the brief).

*Mr. Howard E. Drucks*, Deputy Attorney General, argued the cause for respondent (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

MORGAN, J. A. D.   At approximately 8 P.M. on January 22, 1969 an unknown person, apparently a Caucasian male, armed with a gun, robbed D'Amico's Liquor Store in Magnolia, New Jersey. In the store at the time were the owner, Harry D'Amico, and a customer, Henry Colman. The perpetrator of this robbery wore a dark car coat and a white mask which covered his head and shoulders except for his eyes and the top of

his head. The incident took no more than five minutes and approximately $400 was taken from the store and placed in a brown bag. The intruder then fled through a side door.

Within minutes thereafter, Colman got into his car and searched the area for a car in which the intruder could possibly have fled. Observing a maroon car near the scene of the robbery, and seeing no other cars in the area, he followed it for some distance, noting that it was exceeding the speed limit and was being driven by a single white male with dark hair. He lost the car when it went through a red light, but not before he memorized its license plate number.

The police were summoned to the liquor store and both D'Amico and Colman (after he returned from his pursuit of the car) gave a general description of the intruder. According to this description, the robber was a white male with dark hair, between 5'8" and 5'10" in height, and weight between 160 and 180 lbs. He was wearing a dark coat, a white mask, and was carrying a gun and a brown bag. Colman informed the officer of his pursuit of the car and of its license plate number. About an hour and a half after the offense, the police in Magnolia stopped defendant's car, a maroon 1968 Chevelle, in the general vicinity of the liquor store because it matched the description given by Colman and bore a license plate number with the same digits as the one followed by Colman although in slightly different sequence. A search of the car revealed no money, gun, mask or bag.

Both D'Amico and Colman testified that although defendant fit their general recollection of the robber, they could make no positive identification because they never saw the robber's face.

Kathy Mayer, a ten-year-old girl who lived in close proximity to the liquor store, testified that at about the time of the robbery, while she and a girl friend were playing on a swing, she observed a man, whose head was covered by a white mask, running from the area of the liquor store close to the Mayer's property. He was carrying a brown bag and

was wearing a dark short coat. She observed this man run to a maroon car (which she had first seen earlier that afternoon on returning home from school at about 3 P.M.), fall over a wire on the way to it, get into the car, and drive backwards down the street. Her girl friend, Terri Chapman, gave similar testimony.

Kathy and Terri ran to the house of a neighbor, John Armstrong, to tell him what they had just seen. He ran out of his house in time to see the masked person get into a dark colored, streamline type, new model car, have difficulty getting it into gear, and drive it backwards down Cumberland Street without lights, where it then turned left. From the difficulty the driver had in getting the car into reverse gear, Armstrong concluded that it was equipped with a manual gear shift. When Armstrong later viewed the car driven by defendant, he observed that it was of the same general type as the car which was earlier driven away by the masked person seen by Kathy Mayer and her friend.

Officer Little of the Magnolia police force was the one who stopped defendant's car about an hour and a half after the robbery, within blocks of where it had occurred. He stopped it because it matched the general description of the car pursued by Colman and bore a license plate number containing the same digits as the vehicle previously followed by Colman, except in slightly different order. Little's testimony concerning an abrasion on one of defendant's legs, noted because of his information that the fleeing masked intruder tripped over a wire on the way to his car, completed the State's case.

Following denial of defendant's motion for a judgment of acquittal, defendant produced the deposition testimony of Joseph A. Ialacci, a person bedridden with multiple sclerosis, for whom defendant had been caring. His deposition disclosed that defendant had been working for him on the day of the robbery and had finished work between 2:30 and 2:45 P.M., and that defendant drove a maroon car.[1]

---

[1] In a previous statement given the police soon after his apprehension, defendant had stated that he had not worked for Ialacci

Defendant's wife testified that her husband took her to work at a hospital at about 3 P.M. of the day of the robbery and that when he dropped her off he told her that he was going to see a Mr. Bullock, a lawyer. She admitted that defendant's maroon Chevelle has manual transmission.

Defendant testified that he left work with the intention of seeing his lawyer about filing an appeal from a traffic ticket he had received in the Borough of Pitman. After taking his wife to work he proceeded to Bullock's office. He was told Bullock was at the courthouse, and defendant went there in an effort to find him. After being unable to do so he returned to the office where he consulted with another lawyer, a Mr. Sanderson, who later confirmed that he had seen defendant that afternoon. Defendant then returned to his apartment in Woodbury, made several phone calls, went out and bought some beer, and returned home where he was seen briefly by his brother. This meeting occurred at approximately 7 P.M., about an hour before the robbery. Thereafter, defendant went to Gino's in Glassboro for some food and went looking for some friends whom he never found. At approximately 8 or 8:15 P.M., at about the time of the robbery, he admittedly was driving down Evesham Avenue in Magnolia, near the scene of the crime. He spoke with some gas station attendants in an effort to locate the residence of the friends he was looking for, and was continuing his search at the time his car was stopped by Officer Little. He admitted a prior conviction for armed robbery in North Dakota, but emphatically denied his guilt of the robbery of D'Amico's Liquor Store.

At one point during his cross-examination defendant testified that he had been held in custody "under prejudicial circumstances." When asked what he meant by that he replied that all of the witnesses had stated that he was not the man

on the date of the robbery but that his brother had taken his place. Whether he had worked that day was relevant to determining whether he could have been the person seen by Kathy Mayer earlier in the day.

who had committed the robbery and that he was held nonetheless.

Q. They said you were not the man?
A. That is what D'Amico, Colman and the little girl said. It looked to me that she was indifferent.
Q. D'Amico, Colman and Kathy Mayer came in and saw you and they said you were not the man?
A. That is true.

It was because of this assertion that the State recalled Colman to testify on rebuttal that when he had seen defendant at the police station on the night of the robbery he had stated that defendant fit the description he had given earlier. Patrolman Little was also recalled and testified that D'Amico, too, had stated that defendant fit the general description of the thief. The judge, over objection, permitted Kathy Mayer to be recalled to testify that she had stated on the night of the robbery that she recognized defendant "from the back of his head" (she had only seen the back of his head) as the man she had seen earlier in the afternoon in the maroon car she had identified as being similar to defendant's. The court in the prior *Wade* hearing had ruled Kathy's testimony concerning the identification inadmissible because tainted by the confrontation between Kathy and defendant at the police station on the night of the robbery.

Defendant appeals, contending that the trial judge erroneously overruled his objection to evidence of a 1965 conviction of armed robbery committed by defendant in North Dakota when he was 16 or 17 years of age.[2] Although defendant concedes that he was represented by counsel at the plea which resulted in this conviction, he asserts that he was unrepresented at the proceeding in which the North Dakota juvenile court waived jurisdiction of the offense and permitted

[2]The information from North Dakota indicates that defendant became 17 years of age on November 9, 1964, the same date as the robbery. Defendant contends he was 16 on the date of the offense and 17 on the date of conviction.

him to be tried as an adult, and that the subsequent adult conviction was therefore inadmissible to impeach credibility.

The record of the North Dakota proceedings was unclear in that the "Waiver of Jurisdiction" form from North Dakota, annexed to defendant's brief, referred to a burglary and concealed weapon charge of November 15, 1964, rather than to a charge of armed robbery, although the transcript of the plea supplied us did reflect a counseled plea to armed robbery. We therefore sought clarification from the courts of North Dakota concerning the proceedings affecting defendant and received information which, although not complete, was of considerable help in determining the validity of defendant's contentions. A letter from Judge Ilvedson discloses that at the waiver of jurisdiction proceedings, pertaining to the charge of burglary, presumably committed on November 15, 1964 and substantially contemporaneous with the armed robbery offense, "Robert Lueder was not given a hearing, informed as to his constitutional rights, or told that he had the right to an attorney." Judge Ilvedson stated that in 1964–65, when these proceedings took place, it was not the policy of the North Dakota courts to hold any hearings at all on the waiver of juvenile jurisdiction. "It was done perfunctorily. Our procedure has changed because of decisions of the Supreme Court, and we now hold hearings on such waivers." This change was reflected in the revision of the North Dakota Juvenile Code in 1969. See *N.D.C.C.* 27–20–34.[3]

From the information supplied us by both defendant and the State it would appear that defendant is correct in stating

---

[3]*North Dakota Century Code.* New Jersey practice was otherwise and conformed to the later Supreme Court decisions, *infra. State v. Van Buren,* 29 *N. J.* 548, 555 (1959), required a hearing before juvenile jurisdiction could be waived, in the interest of "fairness" to both the juvenile and the State. *State v. Tuddles,* 38 *N. J.* 565, 577 (1962), required assignment of counsel at all such proceedings to assist the court in "arriving at a decision so meaningful to the juvenile and society."

he was unrepresented at a waiver of juvenile jurisdiction hearing on the armed robbery charge. If such a proceeding was required for the burglary charge which postdated the armed robbery offense, it was equally necessary for the latter despite the fact that we have not been supplied with the form pertaining to the armed robbery. Since the courts in North Dakota admit that no hearing of any kind was held with respect to such waivers and that, at any rate, defendant was not supplied with counsel or advised of his right to such services, we can only conclude that defendant's contention in this regard has merit.

In *Kent v. United States,* 383 *U. S.* 541, 86 *S. Ct.* 1045, 16 *L. Ed.* 2d 84 (1966), it was held that a juvenile does have a right to counsel at that stage of the proceedings at which a juvenile court decides whether or not to turn him over for prosecution as an adult. One of the reasons given for viewing such a waiver of jurisdiction as a " 'critically important' action determining vitally important statutory rights of the juvenile" is that if treated as a juvenile, the child is protected against use of the adjudication against him in subsequent proceedings. 383 *U. S.* at 556, 86 S. Ct. 1055. Contrary to the State's contention, we regard the right recognized in *Kent* as having retroactive application to the present case since trial of the subject offense in which the prior adult conviction was used to impeach credibility took place after November 13, 1967, the date of the decision in *Burgett v. Texas,* 389 *U. S.* 109, 114, 88 *S. Ct.* 258, 19 *L. Ed.* 2d 319 (1967). See also, *United States v. Tucker,* 404 *U. S.* 443, 92 *S. Ct.* 589, 30 *L. Ed.* 2d 592 (1972) ; *State v. Koch,* 118 *N. J. Super.* 421 (App. Div. 1972).

Defendant's guilt of the prior offense, to which he pleaded guilty while assisted by counsel, is beside the point. Had his admitted guilt been disposed of in the juvenile court, such disposition would not have been available for impeachment purposes in the trial of the present offense, both by North Dakota and New Jersey law. *N. J. S. A.* 2A :4–39 (now *N. J. S. A.* 2A :4–64) ; *N.D.C.C.* 27–20–33. The con-

duct of defendant was the same under either disposition, and its evidential value, if any,[4] to impeach defendant's credibility, was the same whether memorialized in an adult conviction or juvenile disposition. The only reason for its availability for impeachment purpose in this trial was the juvenile court's waiver of its jurisdiction over him in favor of a prosecution as an adult, accomplished in a "perfunctory" manner, without defendant being given the services of counsel to which he was later held entitled.

We are therefore constrained to hold that the trial judge committed error in permitting use of this prior adult conviction and that such an error was clearly a prejudicial one. This case was previously tried to a hung jury. The evidence against defendant in this trial was wholly circumstantial in nature. Because of the mask worn by the intruder, neither of the victims of the robbery was able to identify defendant except to say that he fit the general description previously given by them. By their own admission, such a description (between 5'8" and 5'10" in height, 160–180 lbs., dark hair, white, wearing a dark car coat) would have fit literally thousands of persons. He was not seen getting into the car which was later followed by Colman. Colman simply chose a car to follow because it was the only car he could see in the area at the time. An hour and a half after the robbery, when defendant was stopped driving the car which had been followed by Colman, no evidence connected with the crime was found despite the fact that the culprit had used a gun, worn a mask and had absconded with several hundred of dollars in cash. While the State's case was sufficient for jury consideration, the fact that defendant was shown to have previously been convicted of armed robbery, the same

---

[4] Despite doubts as to the legitimate evidential value of the prior conviction to affect defendant's credibility, and fully cognizant of the potential for jury abuse thereof in a wholly circumstantial case, the trial judge was constrained by *State v. Hawthorne*, 49 *N. J.* 130 (1967), to admit the evidence.

offense for which he was being tried, could not help but have a prejudicial effect in the minds of the jury.

We conclude, therefore, that the conviction must be reversed and the matter remanded for a new trial.[5] Because of this holding, it becomes unnecessary for us to consider the other claim of error concerning the propriety of Kathy Mayer's rebuttal testimony.

Reversed and remanded for a new trial.

---

[5] We have rejected the procedure adopted in *Kent v. United States, supra,* of remanding the case to the trial court for a hearing *de novo* as to the propriety of the waiver of the juvenile court's jurisdiction instead of the more drastic alternative of dismissing the indictment. See also, *United States ex rel. Turner v. Rundle,* 438 *F.* 2d 839 (3 Cir. 1971). In neither of the cited cases was the validity of the prior conviction for evidential purposes at issue. In the present case the indictment is not being dismissed; a new trial is being ordered. We do not deem a *de novo* hearing on the propriety of a 1964 waiver of a North Dakota juvenile court's exclusive jurisdiction as being a practicable solution to the problem presented.